# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

DAVID HILBORN,

        Plaintiff,                         CASE NO. 03-CV-71726

-vs-                                        PAUL D. BORMAN
                                             UNITED STATES DISTRICT JUDGE

CHAW KHONG TECHNOLOGY CO.,

        Defendant.
_____/

## OPINION AND ORDER
## DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The matter before the Court is Defendant Chaw Khong Technology Co.'s ("Defendant") June 29, 2007 Motion for Summary Judgment. (Doc. No. 43). Plaintiff David Hilborn ("Plaintiff") filed his Response on August 31, 2007. A motion hearing was held on November 29, 2007. For the following reasons, the Court DENIES Defendant's motion.

**I.    BACKGROUND**

This action arises from Plaintiff's allegation that Defendant, a Tier 2 automotive supplier,[1] breached an oral contract with Plaintiff regarding the payment of commission sales.

Defendant is a manufacturer of automotive parts and other products. (Def. Br. Ex. B, Lin Aff. ¶ 1).

Plaintiff was employed by Auto-Port in 1998 as a full-time Director of Engineering. (Def. Ex. Ex. A, Hilborn Aff. ¶ 3). Auto-Port was involved in low volume mirror assemblies for

---

[1] A Tier 1 supplier sells directly to an auto manufacturer. A Tier 2 supplier sells to a Tier 1 supplier, not directly to an auto manufacturer.

replacements for General Motors, Ford Motor Company, and Chrysler vehicles and was considered a Tier 1 supplier. (*Id.* ¶ 6; Def. Br. Ex. B, Lin Aff. ¶ 9). During 1998, Plaintiff alleges that he found that sub-component price quotations from prospective suppliers were extremely high, due to the low production volumes. (Hilborn Aff. ¶¶ 9-11). Therefore, Plaintiff believed Auto-Port's prices to the market for the final component were going to be high based on the high price for the sub-components. (*Id.*). After deducing that electric motors were main reason for the high price, Plaintiff allegedly inquired if General Motors would be willing to pay the costs of building new tools in Taiwan who could provide tooling and low volume motor sales at low cost. (*Id.* ¶¶ 12-15).

During the time period in which Plaintiff was making these inquires, Auto-Port became insolvent and Plaintiff became aware he was going to lose his job. (*Id.* ¶ 16). Plaintiff alleges that he called Jerry Lin ("Lin"), the CEO of Defendant, and pitched him the idea to supply the tooling for the entire mirror assembly. (Hilborn Aff. ¶ 17; Lin Aff. ¶ 1). Plaintiff informed Lin he would "begin conducting business as an independent engineer for engineering design, development and sales." (Hilborn Aff. ¶ 19). Plaintiff rented an office in Troy, Michigan from Dr. Litton Lee ("Lee"), who was a sales representative for Defendant. (*Id.* ¶ 37).

Plaintiff alleges that he and Lin reached an agreement in which "for all customers, not just sales, [Plaintiff] would be paid ten (10) percent of the selling price for service parts, five (5) percent of the selling price for production (OEM) parts, and a commission on all tooling in varying percentages based on the market. All commissions would be due and payable by [Defendant] when [Defendant] received payment from the customer." (*Id.*). Plaintiff admits that no agreement was ever set down in writing. (*Id.* ¶ 20).

In support of his case, Plaintiff submits a series of emails from Gina Lin, Defendant's project manager, to support the oral agreement. (Plf. Br. Ex. 3, Emails from Gina Lin). On June

17, 1999, Ms. Lin wrote that "Jerry has been counting on both of you, especially, [Plaintiff], for getting the project going and to close deals." (*Id.*) On September 15, 1999, Ms. Lin wrote, "You have given us a lot of information this morning. You have really been helpful. With both you and Litton's effort, hope all of us will benefit from this deal. Of course, we need to strike this deal soon." (*Id.*)

Plaintiff also alleges that he arranged contracts between Defendant and Findlay Industries and Adac Plastics. (*Id.* ¶ 28). Plaintiff also contends he negotiated with Donnelly and Ichikoh who Plaintiff believes contracted with Defendant after his business relationship with Defendant ended. (*Id.*).

Defendant denies the facts set forth in Plaintiff's affidavit. (Lin Aff. ¶ 3). However, Defendant admits that Plaintiff "did provide some services, was somewhat involved in various phases and participated in several discussions in the process of transferring the business to Adac." (*Id.* ¶ 21). Defendant also states that it worked together with Tom Turner, the CEO of Auto-Port, during 1998 and in connection with the endeavor of producing the electric motors and actuators for power mirrors. (*Id.* ¶ 14). Defendant alleges that when Auto-Port went bankrupt, General Motors "resourced" the programs to other Tier 1 suppliers such as Adac Plastics, Findlay Industries, Donnelly and Ichikoh to avoid interruption in supply. (*Id.* ¶ 15). Further, those suppliers were directed by General Motors to continue to use Defendant (and other Tier 2 suppliers) for sub-components to "maintain consistency." (*Id.*) Defendant contends Lin and Turner with the help of Lee eventually convinced General Motors to use Defendant as the supplier for the electric motors. (*Id.* ¶¶ 12,16).

Therefore, Defendant alleges its business was in place before any involvement by Plaintiff and to the extent it was not, Defendant worked with Turner and Lee to expand. (*Id.* ¶ 12).

Defendant and Lee began a business relationship in 1993, when Lee founded Network Engineering, Inc., a sales representative and engineering consulting firm. (Lin Aff. ¶ 6). Lee worked for Defendant as a "fee-based sales representative, engineering consultant and general liaison" until his death on June 22, 2004. (*Id.* ¶ 7). Defendant contends Plaintiff was in business with Lee, and it was Lee who represented Defendant and received payment for services from Defendant. (*Id.* ¶¶ 12, 19, 22). Thus, Defendant contends that Plaintiff's only claim is against Lee, or specifically Lee's estate since Lee died in 2004.

Plaintiff describes his relationship with Lee as one in which Lee was responsible for parts shipment, clerical work and language translation. (Hilborn Aff. ¶ 37). Plaintiff alleges that Lee had no experience in component and plastic product lines and had no business contacts with those whose business was "critical" to Defendant. (*Id.* ¶ 38). Plaintiff states that Lee drafted a memorandum establishing a business agreement between them, but Plaintiff rejected the proposal and never signed the memorandum. (*Id.* ¶ 39, Plf. Br. Ex. 5, Memorandum of Understanding).

On October 31, 1999, Plaintiff terminated his relationship with Defendant by letter. (Def. Br. Ex. C, Termination Letter). Approximately four years later, on May 3, 2003, Plaintiff filed the present action claiming he was never paid the commissions he was owed.

After a delay due to difficulties regarding international service of the Complaint, Defendant responded to the Complaint on January 22, 2004. (Def. Br. at 4). On December 22, 2004, the Court advised to do so by the parties, entered an Order dismissing the case pursuant to a pending settlement agreement. On February 18, 2005, however, Plaintiff moved to vacate the Order of Dismissal due to the fact the parties were unable to reach a settlement. (Doc. No. 13).

On July 20, 2006, Plaintiff moved for Partial Summary Judgment. On March 6, 2007, after Defendant filed a response, Plaintiff withdrew its Motion. On June 29, 2007, after multiple

extensions of the dispositive Motions deadline, Defendant filed the instant Motion seeking summary judgment on all of Plaintiff's asserted claims.

## II. ANALYSIS

### A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id*. at 323; *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this

evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

### B. Breach of Contract

In Michigan the elements of a valid contract are: (1) parties are competent to contract; (2) proper subject matter; (3) a legal consideration; (4) mutuality of agreement; and (5) mutuality of obligation. *Thomas v. Leja*, 187 Mich. App. 418, 422 (1991) (citation omitted). "It is hornbook law that a valid contract requires a meeting of the minds on all the essential terms." *Kamalnath v. Mercy Memorial Hosp. Corp*., 194 Mich. App. 543, 548 (1992). "The burden is on plaintiffs to show the existence of the contract sought to be enforced, and no presumption will be indulged in favor of the execution of a contract since, regardless of the equities in a case, the court cannot make a contract for the parties when none exists." *Id*. at 549 (citation omitted).

As evidenced by the recitation of facts above, there are two wildly different versions of facts presented. Indeed, Defendant's CEO, Jerry Lin, states in his affidavit that he reviewed Plaintiff's

affidavit in this matter and "dispute[s] virtually every assertion regarding CKT because they are not true." (Lin Aff.¶ 3). Plaintiff has submitted an email series which supports his version of the facts that he was involved with Defendant in a business relationship. (*See* Ex. 5). Plaintiff also relies upon the testimony of Richard McFarland, a director of engineering for Adac, who corroborates Plaintiff's allegations to the extent that he testifies that he knew Plaintiff "came in with – I believe it was Litton Lee, and there was discussions and so we all knew what was – there – was the possibilities were out there. And I believe that's where [Defendant and Adac's relationship] got started." (Plf. Br. at 8, quoting unattached McFarland Dep. at 49:34-25 - 50:1-6.).

It is clear from the allegations that whether there was mutuality of obligation or assent is a question of fact and one best left to a jury. Therefore, the Court denies Defendant's Motion for Summary Judgment on this issue.

To the extent Defendant's seek for this Court to determine whether Plaintiff can make a claim as commissions owed on certain contracts, the Court finds there remain issues of fact as to who secured these contracts and when. Therefore, the Court declines to decide which customers Plaintiff may or may not have negotiated with piecemeal.

### C. Michigan Sales Representative Commission Act

Defendant argues Plaintiff's claim under the Michigan Sales Representative Commission Act ("MSRCA"), Mich. Comp. Laws § 600.2961, should be dismissed because the MSRCA does not create a separate cause of action from breach of contract. The Court does not agree. Plaintiff may assert both causes of action.

Michigan courts have explained the purpose of the MSRCA:

> The [M]SRCA was enacted in 1992 to provide special protection to sales representatives, with the Legislature's expressed public policy to provide significant protections for a salesperson to collect his or her commissions. The legislative history reveals that this law is an attempt by Michigan lawmakers to compensate

> sales agents for goodwill and other assets lost that would be difficult to quantify in a dispute. Thus, rather than requiring the harmed agents to resort to costly litigation to provide the detailed accounting necessary to ascertain all relevant damages, the legislature simply chose to assess those additional damages by requiring a principal who intentionally fails to pay commissions due to remit two times that amount to the agent.

*Linsell v. Applied Handling, Inc.*, 266 Mich. App. 1, 14 (2005) (internal citations omitted). The statute itself contemplates a separate cause of action, requiring that, "If a sales representative brings a cause of action pursuant to this section, the court shall award the prevailing party reasonable attorney fees and court costs." Mich. Comp. Laws. § 600.2961(e)(6); *see also Chase v. Matsu Mfg.* 147 Fed. Appx. 507, 510-11 (6th Cir. 2005); *Zantel Mktg. Agency v. Whitesell Corp.*, 265 Mich. App. 559 (2005) (both alleging breach of contract and MSRCA separately). Therefore, Defendant's argument is without merit.

### D.  Unjust Enrichment

In Michigan, the elements for a valid claim of unjust enrichment are: (1) the receipt of a benefit from Plaintiff and (2) an inequity resulting to the Plaintiff because of the retention of said benefit by Defendant. *Barber v. SMH, Inc.*, 202 Mich. App. 366, 375 (1993) (citation omitted). Plaintiff states his claims of unjust enrichment, promissory estoppel in the alternative, to his breach of contract claim.

Defendant argues Plaintiff cannot sustain a claim of unjust enrichment because he cannot show that Defendant received a benefit from Plaintiff. Defendant further contends that because it paid Lee for the sales Plaintiff seeks to claim, it has not been unjustly enriched. However, the Court finds, in light of Plaintiff's affidavit that he conferred the benefit of his services which resulted in contracts with Adac Plastics and Findlay Industries and the corroborating email series, that genuine issues of material fact exist as to the relationship between Defendant and Plaintiff and what if any

benefit Plaintiff conferred and whether Defendant was unjustly enriched by such a benefit. (Hilborn Aff. ¶¶ 25-30, Ex. 5, Gina Lin Emails).

### E. Promissory Estoppel

"The elements of promissory estoppel are: (1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee, (3) which in fact produced reliance or forbearance of that nature, and (4) in circumstances such that the promise must be enforced if injustice is to be avoided." *Barnell v. Taubman Co.*, 203 Mich. App. 110, 122 (1994).

Again, Plaintiff relies upon his affidavit and a corroborating email series to support his claim of promissory estoppel. As genuine issues of fact remain regarding the existence, extent and particulars of Plaintiff and Defendant's business relationship, the Court denies summary judgment on this issue.

### III. CONCLUSION

For all these reasons, the Court **DENIES** Defendant's Motion to for Summary Judgment.

**SO ORDERED**.

                        s/Paul D. Borman
                        PAUL D. BORMAN
                        UNITED STATES DISTRICT JUDGE

Dated: December 10, 2007

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on December 10, 2007.

s/Denise Goodine

Case Manager